We will call our second and last case of this morning, No. 18-1693, United States v. UPMC et al., and Mr. Simpson and Ms. Ellsworth. Excuse me. Good morning, Your Honor. My name is Mark Simpson, and I represent the relators in this case. If I could, I would like to reserve three minutes for rebuttal. That's fine. In granting defendants' motion to dismiss in this case, the district court didn't really analyze any of the three questions that are necessary in order to determine whether the complaint states the claim under the False Claims Act based on an underlying violation of the Stark Law. Those three questions are whether the complaint plausibly alleges the existence of an indirect compensation arrangement, whether it plausibly alleges that defendants don't meet an exception under the statute, and whether it plausibly alleges that they acted knowingly as defined in the False Claims Act. It's amazing how we can start off, and I tell people it happens, for example, with habeas, so I won't get into that, how you can start off with such a simple concept. Don't, if you're a doc, don't refer people down the hall for testing in a lab, for example, that you have a financial interest. That was the whole concept here. Yes, Your Honor. And so it would seem here that you've got to somehow show that there were referrals that, in effect, violated the purpose of the Stark Act. And where is that? Well, Your Honor, what we must show are referrals while there's a compensation arrangement. And the referrals in this case, every time, these are neurosurgeons, and a large portion of their services is performing surgeries in the hospital. And every time the physician performs a procedure in the hospital, there's a referral to the hospital for the associated facility component. The physician would be able to submit a claim for his personally performed services. The hospital submits claims for the hospital component of the services. And this is really exactly the same situation. So in effect, there are referrals to the own, for the doctor to do the surgery, but the ancillary, in effect, the ancillary aspect of the referral is that the hospital benefits from an unnecessary procedure? Well, Your Honor, unnecessary procedure is not really an element of a Stark Law violation. The Stark Law... Or for a procedure that, in effect, you're saying that the billing was too high? No, Your Honor. Congress enacted the Stark Law based upon an understanding that when physicians have financial arrangements with hospitals or other facilities, there's a tendency to overutilize resources. And so, therefore, Congress passed the Stark Law. However, the Stark Law reflects that judgment by prohibiting the referrals if there's a financial relationship unless the parties meet an exception. There is no medical necessity question that is asked in a Stark Law analysis. So you're focusing here, what, on the bonuses? I am focusing on, well, first of all, the existence of the compensation arrangement, which is not really disputed. Defendants raise a question about whether the indirect compensation arrangement definition is satisfied because these are personally performed services that they're compensated for. Having a little trouble following you, is it your point that the referrals are compensated and that's where the violation is? No. In other words, that physicians are getting paid for each referral to a hospital with which they may have some financial arrangement? The physicians have a financial arrangement. Part of that financial arrangement includes a base salary as well as a bonus. Can you focus on where is the wrongdoing here? Where is the fraudulent conduct? The fraudulent conduct, Your Honor, is the submission of claims in violation of the Stark Law. The Stark Law is simple and straightforward. It absolutely prohibits referrals if there's a financial arrangement between the physician and the hospital unless the hospital, unless the arrangement meets an exception. And as this court in Kaczynski held, that's something the defendants have to prove that they satisfied an exception. And every exception requires, every potentially applicable exception requires that the compensation be fair market value. Let's focus in on this. I mean, Kaczynski and Schmidt v. Zimmer assumed that this was part, I mean, we have this intersection of the Stark Law that makes it a defense. But then we have the False Claims Act that requires scienter. So there's this question about whether it remains a defense, whether it's an affirmative element you have to allege in the complaint as to whether awareness that it wasn't fair market value. Right. And on that point, this court, this court in Zimmer noted that a jury finding the defendant acted knowingly under the False Claims Act doesn't require scienter, as it's commonly understood, but instead could be based on mere passive disregard that the jury finds to have been reckless. Right. It doesn't require knowledge. Recklessness is sufficient. Let's assume that there is some requirement to plead this. Right. We've got arguments about whether it's an element of defense, one for false conduct. But what is the smoke that telegraphs fire? Well, as alleged in the complaint, your honor, it is widely recognized as a red flag in the industry. The compensation is above fair market value when a physician is compensated above the 90th percentile in the profession. And we have detailed allegations about, you know, physician compensation surveys that reflect the compensation for neurosurgeons at the median, at the 75th percentile, and at the 90th percentile. And in this case, we have shown that many of these physicians, they're not just being compensated at around the 90th percentile, they're being compensated multiples of the 90th percentile. And so that's the 10 percent of the highest paid neurosurgeons in the country. Is that where the smoke is? I think that is really where the smoke is. To see what the fire is. That and the fact that the compensation is largely, not entirely, but largely driven by the WRVUs that the physicians are credited with. And again, we have survey information showing neurosurgeons the number of RVUs that they generate at the median 75th percentile and the 90th percentile. And that by itself could be that they're just very hard working. Is the RVU rate doing some of the work here? It is doing some of the work, Your Honor, but it is not doing all of the work. And your point is that it could be that they are being proficient. We allege in the complaint that it is simply not credible for a physician to regularly generate more than 25,000 RVUs. And that's an allegation that has to be accepted as true at this stage, Your Honor. And not only that, we have alleged several ways, specific ways, in which the WRVU numbers for these physicians were in fact inflated. Now, it's not an exclusive list of ways, but, you know, one of the ways is that physicians were being credited as being first assistants in surgeries when they did not meet the requirements. They were being credited as teaching physicians when they didn't meet the requirements to do so. What's the relevance of Dr. Kassam here? The relevance of Dr. Kassam? Well, he was, for a period of time, the chairman of the department. And the allegation is that he was sort of the driving force behind getting the physicians to really up their WRVU production, which skyrocketed, you know, beginning in 2006. So, I mean, he is one of several players in this. Does he contribute, is there any relevance to scienter or corporate knowledge? Well, yes, because the, I do want to back up a second. The scienter that's required under the False Claims Act here is just knowledge that at most, knowledge that they're not going to satisfy an exception. Right. And that is met simply by showing that the defendants had access to physician surveys where they could see that their physicians were being compensated multiples of the 90th, not just above the 90th, multiples of the 90th percentile, that they were generating RV, claiming to generate RVUs that were many multiples of the 90th percentile, the busiest surgeons in the country. And then there are certain specific ways in which we have shown that the RVU numbers would be inflated. And those are not just plausible, but they, I'm sorry. Could you finish up that question and then I'll come in. The United States intervened in a portion of this case and entered into a settlement agreement with the defendants for these. For $2.5 million, right? For the submission of false physician claims relating to this first assistant teaching position, the multilevel laminectomy by Dr. Bajani. Those claims have been settled as to the submission of false claims for physician services. But those underlying facts are what render plausible. Let's go back to Judge Fuente's question about the smoking gun. Actually, both of my colleagues mentioned smoking gun. Don't you really need some allegation that the people at UPMC deliberately fashioned a compensation system to reflect the value of the referrals? No, Your Honor. What we need is an allegation that UPMC fashioned a compensation system which led to physicians being paid above fair market value. Well, isn't Medicare the cheapest payer out there in the health care system? I think that's probably a fair statement, Your Honor. So what's so suspicious for a surgeon to be paid above the Medicare rate? Well, it's not, our complaint is not simply that they're being paid above the Medicare rate. Our complaint is that physicians... The Medicare rate would be what, $35? About $35. And they're paid, they're here what, about $45? Well, they're $45 plus they're getting a base salary. So it is not, that is not the only component of their salary. I thought your own, the data in your own complaint showed that the national average rate of compensation is around $50 or $60 per WRVU. Yes, Your Honor. The actual compensation is going to include things other than the WRVU rate. There's also going to be, there's also an RVU rate for malpractice, for physician practice and things like that. Do you also factor in compensation based on the complexity of the surgery, or are you just averaging out the compensations made? Well, complexity of the surgery is definitely going to enter into it. And again, that is one of the allegations we have is that designing the system this way led to them performing overly complex procedures. Now, that is not a sine qua non of a Stark Law violation. It is a background fact. Well, could you be more specific about the violation in this case? I'm sorry? Could you be more specific about the Stark violation in this case? Yes, the Stark violation is that the physician, the physicians have an incentive to perform procedures at the hospital. And in connection, the physicians are being paid amounts that are greatly in excess of fair market value. And that is the fundamental... And what does that mean to you? What that means to me is that this is a compensation scheme that is designed to reward the physicians for referring business to the hospital. Counsel, we don't have any allegations here about the proportions of Medicare or Medicaid patients at this hospital, do we? There are allegations that I believe the complaint alleges that the majority of the... The majority, but we don't know... And that's not an issue in the motion to dismiss either. Well, I see my time has expired, Your Honor, so... How many minutes did you reserve for rebuttal? Three? Three minutes, yes, Your Honor. Okay, we'll get you back to rebuttal. Good morning, and may it please the Court. Jessica Ellsworth on behalf of UPMC and UPP. I think Your Honor's questions had it exactly right. This is a case in which the allegations in the second amended complaint didn't have smoke that would indicate a fire and didn't have facts that would indicate a fire. And without... You don't consider being paid two or three times the 90th percentile to be smoke? So let me answer that question. Yes or no? Standing alone, no. You don't consider a $2.5 million settlement in a prior false claims act case to be smoke? Again, Your Honor, there is no admission of liability in that. The answer is no. You don't consider allegations that surgeons were putting other surgeons on falsely as first assistants to be smoke? There is no particularity to that. We have to accept that as true. Do you consider it to be smoke? Your Honor, if it were pled with particularity, I think that there could be something to it. You don't consider it particular enough, and we're supposed to dismiss it under Twombly, you think? Well, it's actually 9B, not Twombly, that applies in this context. But if you look, I think you referenced... All right. Do you consider the pleading that the teaching assistants were falsely done, that the only reason that's not smoke is because it's not pleaded particularly enough? Not only would it need to be pleaded with particularity, and if you look at those allegations, paragraphs 149 to paragraphs 178, there are two doctors mentioned, too. There is no indication of any time period for that generalized allegation. Let's talk about time period. We have a time period of 2006 to 2009. We have a market run-up in RVUs. We have Dr. Kassam brought in in 2006. We have allegations of statements made to others that there was some pressure to pump up the RVUs. Is that smoke or not? Your Honor, it is no more smoke than the chairman of my law firm saying on January 1 of every year, guys, this is the year we're all going to work harder. This is the year we're going to do more work for our clients. This is the year we're going to have great outcomes. There's nothing about that standing alone that shows these compensation arrangements. And let's be clear, this is alleged to be a form standard contract that UPP uses for all of its physicians, whether they're neurosurgeons, they are mental health care providers, they are dermatologists, they are ENTs, they are pediatricians. It is a form contract. It is set up, UPP has set it up using the Medicare-sanctioned metric of RVUs that are designed to compensate physicians for their work that they personally perform. We have an allegation here that a majority of the patients are being covered by Medicare and Medicaid and the physicians are essentially a loss leader for the hospital and are getting paid 130% of what they're bringing in on these procedures. Is that smoke? Your Honor, we don't have that allegation in this complaint. There is that allegation in some Stark Act cases. Let's try it another way. Let's assume the allegation is made in the complaint. Would that be smoke? It could be smoke. Certainly in some cases, courts have concluded that it is smoke. So if, for example, you combine a salary well over the 90th percentile on this survey data with an RVU level that's far below the median, so you can look at the combination of those two things and say, on its face it looks like there's something problematic here. But what we have are RVU levels for some of the physicians alleged, compensation alleged for only four, and both of them point in the same direction. These are, under their own allegations, these are doctors who were credited with earning a large number of RVUs and were compensated based on those RVUs. The purpose of Stark, and if we just take a step back, Stark's purpose, the design of it is to get at situations where a doctor has a financial interest, an ownership interest, an investment interest, a compensation interest, in dollars that are flowing to some other entity. All right. Let's talk about Tuolumne. Does your case depend on our respectfully disagreeing with our sister circuit, the Fourth Circuit in Tuolumne? It does not. Well, the Fourth Circuit in Tuolumne held, it said at page 374, there is a referral when hospital bills a facility fee in connection with personally performed service. And it cited the Federal Register passages. So there didn't have to be a direct causal relationship. Just that there were allegations in the complaint here from about paragraph 191 through the low 200s that the hospital is benefiting similarly to the way that the hospitals benefit in Tuolumne from the different fees that it's getting as a result. So it doesn't, unless we're to disagree with Tuolumne, and the Federal Register, it doesn't seem to require that there be a strict causal relationship. It can be this indirect, there's a causation, a correlation here, and the hospital winds up making more money, a rising tide lifts all boats. So, Your Honor, respectfully, I think if you want to look at the purpose of the Stark Act, and I would point the Court to- I'd prefer to focus on the language and then get to the purpose.  Let's talk about Tuolumne since you brought it up. I think there are two important things about Tuolumne to keep in mind. The first is that in Tuolumne, there was a significant amount of factual allegations and then facts that actually played out at trial showing that we had, that that case involved disguised payments for referrals. These were part-time employment contracts negotiated for one particular practice out of extensively documented concern about the hospital losing those referral dollars because the doctors were going to open a competing ambulatory surgery center. All of those sorts of facts that go into what the intent was behind the contract are very different from this case. The concern about losing referral dollars that shows up in Tuolumne is not here. This is a case in which the standard contract- again, it's a standard contract that's set up based on our views. It makes the physicians in this case- honestly, they're agnostic to whether there are referrals or not. Their compensation depends on what they personally do. It may involve a referral, it may not. To the extent that the TUMI court looked at the fact that those surgeons were only doing outpatient procedures- their office visits were somewhere else. They were only doing outpatient procedures and so there was automatically a one-to-one correlation. That's different from this case. You've done a good dive into the record, except I don't read the passages on page 379 as actually turning on that. The more that the hospital got from the physicians performing- in sum, the more procedures the physicians performed at the hospital, the more facility fees TUMI collected, and the more compensation the physicians received in the form of increased base salaries and productivity bonuses. So I don't see this as turning on disguised compensation allegations. I don't see this turning on part-time or outpatient. It's turning on the discussion earlier there that varies is broader than takes into account. The rising tide lifts the boats, even though there's not a one-to-one causal relationship. So, Your Honor, if you're right, and if that's how you read TUMI, then I think it is wrongly decided. Explain why you think that is. So I'll start by pointing to the federal registry notice that was put out this summer that we cited in our brief, the request for information, because CMS is looking at whether to revise the Stark Law. And as they explained- Could you tell me the citation? 83 Federal Register 29525. And what this says is, by design, the Stark Law is intended to disconnect a physician's health care decision-making from his or her financial interests in other health care providers and suppliers. It's the scenario that Judge Ambrose mentioned with the doctor who's sending someone down the hall to get physical therapy because he happens to own the physical therapy facility as well. It is a financial interest in other providers. RVU-based contracts give physicians a financial interest in their own work. And what the commentary extensively discusses whenever this issue of personally performed services come up is that the Stark Act is not concerned with personally performed services. The Stark Act is concerned with where a doctor has skin in the game of some other practice. But Twomey does say if a scheme was designed to reward a physician for that physician's own referrals, you could have a problem, even if you have a fixed annual salary. And what is your argument as to how you would distinguish Twomey? There is no similar allegation of scheme here. That's the simple fact of it. I thought you were going to focus on referrals as opposed to scheme. You can focus on that as well. I think there are multiple ways to get at differences. But I do want to emphasize, because I think it's important, Judge Bibas, you mentioned the allegations in the complaint about performing more complex procedures than necessary that are in the paragraphs 188 to paragraph 212. There is no mention of a single doctor in those paragraphs. There is no mention of a single procedure. And there is no mention of how UPMC or UPP knew that any procedure was being performed as a more complex one than it should have been performed as. We want to talk about the teaching physician fraud. There are, as I said, only mentions of two doctors with no time period, with no identification of a surgery. And I think the district court judge was right to say, if you want to come in here and say an RVU-based contract is problematic and creates this indirect financial relationship, you have to give me some facts. And they have to be applied with particularity that show me that this is a disguised payment for referrals. As I understand part of Mr. Simpson's claim, it is that the doctor's compensation based on the WRVUs is so high that in fact the referrals, or payment for referrals, is embedded within the WRVUs. So you refer to paragraphs 191 to 218, but 218 is where they actually start naming physicians Bejani, Spiro, Kassam, Ablah, have the charts, have the run-up in compensation in the years 2006 to 2012. So, Your Honor, I think you're talking about the billing for services not rendered, paragraphs 179 to 185. There are two doctors mentioned. One is Bejani. And I think it's very important when you look at that allegation of Bejani to couple it with recital C in the settlement agreement, which shows that UPMC did not bless this situation, and in fact it affirmatively went to the government when it learned of it before it knew that this case had been filed. And you can see that again in settlement recital C. There is also a reference to Dr. Al-Qadi having a billing shortcut. There are no specifics about what that shortcut is, no allegation that UPP or UPMC or any hospital knew about this shortcut at any time that would have been relevant to whether this is a Stark Act violation. I think it's telling when you look at the later scienter argument, really to look at their reply brief. They spend one paragraph arguing that they're scienter, and it's at pages 25 to 26, and they say three things. First, that the doctors knew the compensation exceeded fair market value. There's no citation. Second, that the defendants knew the RVUs were implausible just because they were high, citing survey data. That's wrong. Whether or not RVUs are implausible does not turn on simply the number. And I think you can see that by you want to take the highest number that's in the complaint. It's about 54,000. There's an allegation in the complaint of a particular surgery that is worth 100 RVUs. Can you consider that DWRVUs in this case are well, well beyond the national average? They are beyond three. I'm just seeing that they're being compensated also for making referrals. Well, they are beyond three survey data points that the relators have offered you. But there's no information about where those data points were drawn from and who the couple hundred respondents were that went into calculating those data points and whether they were at comparable hospitals, whether they were doctors with comparable practices, whether they were performing the same complexity of surgery, or they were at a small community-based rural hospital in central Pennsylvania where I grew up that might have only one neurosurgeon because they don't have a high volume. So simply looking at survey data alone is not a valid way to find either that there was compensation beyond fair market value or that there's something essentially fishy going on here that UPMC and UPP knew about. Let's talk about Sienter. Dr. Kassam was in administration, so his knowledge would be imputed to UPMC. You have an allegation in paragraph 229 that he said something to Relator Slabasi that UPMC's administration terminated him even though he did everything they asked him to do, which in context Relator understood to refer to pumping up the volume of WRVUs. Now, we can talk about whether that was specific enough or not, but if it was specific enough that the Relator was told by an administrator to pump up the volume of RVUs, your response is, well, that's just making it more profitable and it doesn't imply anything dishonest here? Certainly. I can bill 1,800 hours this year or I can bill 2,200 hours this year. That doesn't mean that it's somehow fraudulent simply because I end up working harder. On the outlier point, in law firms, there is always going to be someone who bills 3,000 hours a year and someone who bills 1,800 hours a year. The median may be somewhere in the middle, and you have outliers. This is a preeminent health care system employing preeminent physicians to perform complex surgeries that people travel from everywhere to come receive their health care here. It's not enough to just say these doctors had high RVUs and four of them, again, there's only compensation data about four of them, four of them were paid a set level. When you look at the contract, the contract contains no information that would allow you to draw any direct or indirect inference that there is disguised payments for referrals here. The last point I would just briefly make is that the other thing the survey data does do is show that the per RVU, just using the data, the per RVU compensation for neurosurgeons on that data alone is somewhere in the $50 to $60 an hour range. Let's go back to the law firm analogy. Let's say two years from now, your billables at your law firm go up from 2,200 to 4,000 hours a year. No scienter on the part of the law firm that there's any fraud going on? I think the law firm would want to know, did I happen to have three cases that went to trial? Did I happen to have four Supreme Court arguments? Did I happen to have three clients under investigation? What is the reason for it? Certainly they might be interested in understanding it, but just the number alone. Are they on notice to inquire and investigate why someone's working 4,000 hours a year, billing 4,000 hours a year? I would hope from a mental health perspective they would be interested in knowing the answer to that question. Or from a legal perspective, if they encourage it, don't ask too many questions, don't audit it. Could we find that to be reckless? I think that you could. That you could certainly, you could wonder about it, but you would want there to be. Hire the associates who, the 1,800, 2,200, we keep the people 4,000, we don't ask questions. Reckless? I don't know that there's any obligation to ask questions in that situation. There are, so let me give you an example. There's one case that's cited in the reply brief, the Riley case that the relators cite. And there was a situation where one of the doctors in the complaint is alleged to have been credited with RVUs that work out to 9,000 hours a year. And the relator points out there's only 8,700 hours in a year. In that situation, I think you could certainly say that there is reckless disregard to not. Okay, so it has to be more than the physical number of hours in the year before there's reckless. I'm not saying it has to, but I'm saying that would be one circumstance that I think you could find would trigger an obligation to do that. The facts that are pled here, simply that some doctors had high RVUs based on instructions and guidance from their leaders to work hard, is not enough to find that there is an intention to disguise. Again, this is about. Not enough to get discovery. We're not talking about jury liability. You're saying at the motion-to-dismiss stage, it's not enough to even plausibly raise an inference that requires discovery. Well, first of all, again, not to keep pressing on this, but it has to be pled with particularity, which is a higher standard. And that's because this is a fraud statute. We're not looking at just kind of inadvertent mistakes. We're looking for fraud. And so you do need to have particularity. You need to have specifics about how RVUs were being used to disguise payments for referrals. There's no discussion about anticipated referral dollars. There's no discussion about net operating losses that are going to result from these contracts. There's actually almost no information about the contracts themselves. We don't know what the base salary is. There's no allegation about how many RVUs have to be completed to make that base salary. There's not even an allegation that any of these doctors got a productivity bonus. I mean, all we really have is the allegation that there are two components in the contract, a base component and a potential productivity component. And in the productivity component, the RVU payment is at a $45 per RVU value. And that's it. And on these facts, there was simply not enough to require discovery. There was not enough to get beyond a motion to dismiss. And for those reasons – It sort of brings us at the end where we started at the beginning. When you have a motion to dismiss, in connection with a complaint that is quite lengthy, has a lot of facts in it, to say that there is no way that you can get past the allegations, they just simply don't make a claim here, we have to look at it pretty carefully. So the question becomes, some call it prima facie, is there enough smoke that we should get discovery in effect? And when you have all the exceptions in the Stark Act, they seem to require that the compensation not exceed fair market value. And it looks as if the productivity compensation bonus here for these neurosurgeons exceeds the typical Medicare metric for fair market value. Maybe the answer is they're just more productive. That may be the answer. But the claim would be, let me get to discovery to find out if she's really correct or if she's not. Your Honor, and I would just say again, in a fraud case, you have to plead with particularity, so that discovery is not about fishing expeditions, all of the sort of harms that come from being labeled a fraudster that this court has repeatedly identified as a reason to have a higher pleading standard. And then secondarily, because it's a fraud case, there's also this very important scienter component. And in Escobar, the Supreme Court, which postdates this court's reference to scienter in the Kaczynski decision that you referenced, Judge Bevis. In Escobar, the Supreme Court went out of its way to stress that scienter should be rigorously enforced and it is a stringent requirement. It is what cabins these cases. But back again to where we started. If you're paid two to three times more than normal, if you've paid out a penalty of $2.5 million in a connection with a settlement, and if there's concessions that certain people were put in positions for purposes of getting payment that they should not have been put into, when you add all of that together with regard to what's been alleged here, at the very least, should you not allow a chance to amend the complaint again? Now, I realize it was offered once. It was offered once, and really I think it's important to know that when it was offered, the judge said, give this your last best chance. And what the relators did was come back by moving some things around, shifting some titles, but not really adding any new facts. And if I could just push back on one point, Judge Ambrose, you suggested that there are allegations that these doctors were being paid more than is normal. And I think your reference to normal is a suggestion that the survey data suggests a lower median. Fair market value, and you can see this just in the definition alone of fair market value, which is at 42 CFR 411.351. Fair market value is not determined by just doing a comparison to benchmark data. But this is well above the 90th percentile. It is. And so this is why there's a whole industry of consultants who work with hospitals and health care systems to determine fair market value. It's one data point for a fair market analysis, but other data points are, what are you being paid to do? Were the doctors who were involved in responding to that survey, were they working as many hours on as many complex surgeries? Did they have the same professional credentials? Did they have the same years of experience? Had they done the same fellowships? Were they working in the same kind of geographic market? All of those factors are relevant so that you're sure that fair market value is an apples to apples comparison. But it seems that your theme, your pivot back for a lot of questions is they just didn't plead it with particularity. You keep falling back on rule nine. I think that's right. And I do that in part because the relators suggested that we were coming to this court and saying RVU-based contracts are somehow immune from the Stark Law. And that is not our position. Our position is that an RVU-based contract could be a problem in a circumstance in which there were facts that showed the RVU-based contract was in fact a disguised mechanism for paying doctors for referrals. But our point is that those facts aren't here. And so you don't need to answer what really is a harder question, whether RVU-based contracts are somehow per se a problem. And you just have to look at this complaint. And on these facts, as they came to the court, brought by three relators who were involved in this health care system, they couldn't put any meat on the bones of this allegation that somehow this was an improper arrangement designed for improper means. It was all about compensating for referral dollars. It's a standard contract with almost no facts pled about what it entailed. And for all of these reasons, we would ask that you affirm the decision of the district court. Thank you very much. Thank you. Thank you. What about the point Judge Bassoon said? I'm going to give you, maybe against my better judgment, I'm going to give you one last best chance to plead. And you came back essentially with the same allegations as you had done before. As you know, for her, that wasn't going to be enough. Your Honor. Why don't you get another chance? Well, Your Honor, I don't think we need another chance. And I disagree with you, Your Honor, that we didn't do anything different. The second minute complaint. I mean, when her order denying the second time around, I guess you filed what, July 21st of 17 or something like that? It's been a while. And then came back quickly and said, I don't see anything new. Well, Your Honor, I can tell you what was new. One of the things that was new was we included detailed WRVU numbers. We included salary numbers for physicians. And the Feds Council said that there was only salary information for four physicians. That's not true. There are four physicians who were included on the 990s filed for the nonprofit. Paragraph 125 also includes allegations that Dr. Elkady, who, you know, was 300 and something percent above the 90th percentile in the RVUs. Which paragraph? 125. Okay. And his salary wouldn't have been included in the 990s because he worked for the one subsidiary that was a for-profit. What is your, Mr. Simpson, your very best pitch that an improper referral scheme occurred here? My very best pitch is the allegations in the complaint that have to be, that are supposed to be believed as true, that it is not credible that physicians could routinely generate more than 25,000 RVUs. The allegations that we know of specific ways in which the WRVU numbers were ginned up. I would also direct your attention to paragraph 146 of the complaint, which. Is it not credible because those numbers were vastly higher than normal or standard RVUs? Yes, Your Honor, and vastly is an understatement, I would submit. These are numbers that are simply out of the ballpark. Okay. And when you combine that with the specific ways we know that they did, in fact, inflate RVUs. And then when you combine that with the fact that if you take the highest paid neurosurgeons in the country, these people are making two or three times how much they are making. And then you combine that with the allegations that that fact standing alone is widely viewed in the industry as being a red flag of overfair market value compensation. You have more than a smoking gun, I think, Your Honor. And, again, I was going to point, Your Honor, to paragraph 146, where the chief of surgery at UPM Shadyside told the writer Bookwalter that the administration was aware of first assistant abuse and other situations, but that they weren't worried because they didn't think Medicare would drill down to that level of detail. Also, the suggestion that we only named a couple of doctors only first assistant fraud or teaching positions is just not true. Paragraph 136. You look at paragraph 146. I'm sorry? You look at paragraph 146. I mean, is that enough to get you over the hump in terms of what you need to do to plead with particularity? Your Honor, this is one paragraph in a very long complaint. No, it's a comprehensive complaint. There's no doubt about it. This one paragraph very well could be, but this is not the only paragraph. It's combined with a whole lot of other things. The defendant's demand is not for particularity. Their demand is that we prove with evidence our case in a complaint, and that has never been required on a motion to dismiss. And, you know, I would point your honors to this court's approach in the Schmidt v. Zimmer case, where the court reversed the grant of a motion to dismiss in a false claim to that case, where, to be honest, the theory of liability was more complicated than this one. You had a purchasing arrangement between a supplier and a purchasing agent for a group of facilities and dealt with the pricing and discounts, you know, and an allegation that the manufacturer caused the health system to falsely certify compliance. In that case, this court's analysis was it said that, according to Zimmer, it's apparent from the face of the complaint that the marketing program did not violate the anti-K-Becker-Stark Act. Then the court goes on to say, based on our reading of the First Amendment complaint, it's not clear that the alleged conduct of Zimmer passes muster under the anti-K-Becker-Stark Acts. We therefore conclude that these issues can't be resolved in the context of a motion to dismiss. Accordingly, like the district court, we assume without deciding, for purposes of this appeal, that Zimmer's marketing program violated both acts. And so I would submit to you, your honor, that the arguments about what is missing in this complaint, these are arguments for trial. They're not arguments for a complaint to state a claim. If you cannot plausibly allege that physicians are being compensated above fair market value when they are being compensated multiples of the 90th percentile and when they are allegedly generating RVUs that are not believable, that are multiples of the 90th percentile, and when we know that they've settled claims that would lead to inflated RVUs, then it is going to be almost impossible to state a claim. All right. Thank you very much. Thank you. Thank you to both counsels for well-presented arguments and well-briefed arguments. I would ask that a transcript be prepared of this whole argument and just check with the clerk's office.